UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONWIDE LIFE INSURANCE COMPANY
OF AMERICA,

          Plaintiff,

v.

ROBERT RAWISZER,
DAVID RAWISZER,

          Defendants.

Civil Action No.



## COMPLAINT

Nationwide Life Insurance Company of America ("Nationwide Life"), by its undersigned attorneys, brings the following Complaint for injunctive relief and damages against Defendants Robert Rawiszer and David Rawiszer for (i) breach of contract; (ii) conversion and misappropriation of trade secrets and confidential business information; (iii) unfair competition; and (iv) tortious interference with economic advantage, and in support thereof avers as follows:

### I. PARTIES

1.     Nationwide Life, formerly Provident Mutual Life Insurance Company, is a wholly owned subsidiary of Nationwide Financial Services, Inc. Nationwide Life is a Pennsylvania corporation and maintains its principal place of business in Delaware.

2.     Robert and David Rawiszer, who are father and son, formerly were affiliated with Nationwide Life's agency located at 303 South Broadway, Suite 410, Tarrytown, New York 10591. Upon information and belief, Robert and David Rawiszer both are citizens of the state of Florida.

#1261898 v1
106783-61951

## II. JURISDICTION AND VENUE

3.  Jurisdiction exists by virtue of diversity of citizenship, 28 U.S.C. §1332. The amount in controversy exceeds Seventy Five Thousand Dollars ($75,000), exclusive of interest and costs, against each of the Defendants. Venue is proper as the conduct complained of herein took place in this judicial district.

## III. FACTS COMMON TO ALL COUNTS

4.  Nationwide Life is a life insurance and financial services company conducting business throughout the United States.

5.  As a condition of his affiliation with Nationwide Life, Robert Rawiszer signed a Special Agent's Agreement. A copy of Robert Rawiszer's Special Agent's Agreement is attached hereto as Exhibit "A."

6.  As a condition of his affiliation with Nationwide Life, David Rawiszer also signed a Special Agent's Agreement. A copy of David Rawiszer's Special Agent's Agreement is attached hereto as Exhibit "B."

7.  In their Special Agent's Agreements, Defendants explicitly agreed, inter alia, as follows: "For one year after termination of this Agreement, the Special Agent shall not directly or indirectly advise, induce, or solicit any policyholder of the Company to lapse, cancel, or replace any policy or contract of the Company or borrow values from any policy or contract of the Company to pay any premium on a policy of another Company." (Exhibits "A" and "B" at paragraph 13).

8.  Defendants also agreed that "[i]n the event the Special Agent violates this provision, the Special Agent agrees that the Company may pursue all remedies, legal or equitable, including injunction, to enforce compliance with this provision and the Special Agent shall be responsible for the payment of any legal fees." Id. (emphasis added).

9. The Special Agent Agreements signed by Defendants also contain confidentiality covenants. Specifically, both Defendants agreed that:

> The Company has a proprietary interest in any books, accounts, computer and/or other records, documents, policy record cards, applications, vouchers, letters, written correspondence with policyholders and the Company, and all other items provided by the Company, and relating to or connected with the business of the Company or a subsidiary Company, and such accounts and records are the property of the Company. Upon termination of this Agreement by either party, for any reason, the Special Agent agrees to return immediately to the Company all accounts and records as defined above. The Special Agent shall at all times, up to and including the return of said accounts and records to the Company, preserve and protect the confidentiality of such accounts, records or other items. The Special Agent's breach of this confidentiality by releasing any information contained in said accounts, records and other items to other than the client, the client's advisors, or persons specifically authorized by the Company, shall be deemed a violation of this Agreement.

(Exhibits "A" and "B" at paragraph 9).

10. 'Robert and David Rawiszer's affiliations with Nationwide Life terminated on October 19, 2007 and July 27, 2007, respectively.

11. Upon information and belief, even before their affiliations terminated with Nationwide Life, Defendants were encouraging and/or inducing Nationwide Life policyholders to replace their Nationwide Life policies.

12. Upon information and belief, Defendants have continued to violate their contractual obligation not to "directly or indirectly advise, induce or solicit any policyholder of the Company to lapse, cancel or replace any policy or contract of the Company…."

13. In fact, at least 30 Nationwide Life policyholders the Defendants serviced have notified Nationwide Life of their intent to replace their Nationwide Life policies. Some of these replacements began before Defendants' affiliations with Nationwide Life even had terminated. Since Defendants' affiliations with Nationwide Life terminated, the replacements have increased and are continuing to occur on a persistent basis.

14. The amount of replacements by the Nationwide Life policyholders serviced by

#1261898 v1
106783-61951

both the Defendants in such a concentrated timeframe is very high as compared to the amount of replacement requests Nationwide Life typically receives from its policyholders.

15. Notably, these Nationwide Life policies are being replaced virtually entirely with policies for Penn Mutual Life Insurance Company, the company with which Defendants currently are affiliated.

16. In many instances, replacement is not in the best interests of the policyholder. Replacement of a life insurance policy requires new underwriting, the policyholder is insured at an older age, there is a new rescission period and, in certain instances, the former insurance company applies surrender charges that reduce the cash surrender value that had accumulated in the policies. New York has extensive regulations governing the replacement process because of the possible detrimental impact on life insurance policyholders.

17. Upon information and belief, Defendants also violated their confidentiality obligations to Nationwide Life.

18. In particular, as noted above, Defendants both agreed that "[u]pon termination of this Agreement by either party, for any reason, the Special Agent agrees to return immediately to the Company all accounts and records as defined above." (Exhibits "A" and "B" at paragraph 9).

19. Since the time of their terminations and continuing to the present, Defendants have failed to return files on Nationwide Life policyholders in violation of their contracts.

20. Upon information and belief, Defendants also have utilized records and/or information on Nationwide Life policyholders to their own advantage, in further violation of their contracts.

21. The documents Nationwide Life believes Defendants retained and/or removed in violation of their confidentiality obligations (either in original or copied form) contain highly

- 4 -

#1261898 v1
106783-61951

sensitive and proprietary information including, without limitation, the identities, addresses and contact information of Nationwide Life policyholders.

22. These documents also contain highly confidential financial information relating to Nationwide Life's policyholders including, without limitation, the face amounts of the policies, the annual premiums paid by Nationwide Life policyholders, the maturity dates of policies and the investments (such as equities and fixed income instruments) owned by Nationwide Life policyholders and held in the sub-accounts of their Nationwide Life policies.

23. This highly confidential and sensitive information was entrusted to Nationwide Life by its policyholders with the expectation it would be kept confidential.

24. Upon information and belief, Defendants have engaged in acts which constitute unfair competition and are in violation of Defendants' contractual, trade secret, and/or other legal obligations to Nationwide Life.

## COUNT I
## INJUNCTIVE RELIEF

25. The allegations of Paragraphs 1 through 24 are incorporated by reference herein with the same force and effect as if set forth in full below.

26. By virtue of the foregoing, Nationwide Life has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against the Defendants.

27. Unless Defendants are preliminarily enjoined from violating the terms of their contracts, misappropriating Nationwide Life's trade secrets, and engaging in other acts of unfair competition, Nationwide Life will be irreparably harmed by:

 (a) Disclosure of trade secrets, customer lists, and other confidential information which are solely the property of Nationwide Life and its policyholders;

#1261898 v1
106783-61951

(b) Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

(c) Negative and/or inaccurate representations the Defendants may be making about Nationwide Life designed to entice policyholders to replace Nationwide Life policies and, in the process, suffer financial detriment themselves; and

(d) Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

28. Nationwide Life has no adequate remedy at law.

WHEREFORE, Nationwide Life respectfully requests that:

(a) A Preliminary and Permanent Injunction Order issue immediately, enjoining Defendants, directly or indirectly, and whether alone or in concert with others, from:

    (i) Advising, inducing, or soliciting any policyholder of Nationwide Life to lapse, cancel, or replace any policy or contract of Nationwide Life or borrow values from any policy or contract of Nationwide Life to pay any premium on a policy of another company;

    (ii) Using, disclosing, or transmitting for any purpose, any books, accounts, computer and/or records, documents, policy record cards, applications, vouchers, letters, written correspondence with policyholders and Nationwide Life, and all other items provided by Nationwide Life, and relating to or

connected with the business of Nationwide Life or a subsidiary company (hereinafter referred to as "Nationwide Life Records");

(iii) Retaining, in any form, including without limitation original, copied, computerized, handwritten or any other form, any Nationwide Life Records; and

(iv) Any and all other such relief as this Court deems appropriate.

## COUNT II
## BREACH OF CONTRACT

29. The allegations of Paragraphs 1 through 28 are incorporated herein by reference with the same force and effect as if set forth in full below.

30. Upon information and belief, Defendants have breached the provisions of the Special Agent's Agreement attached hereto as Exhibits "A" and "B."

31. As a consequence of the foregoing, Nationwide Life has suffered damages.

32. Nationwide Life also has been forced to incur attorneys' fees in enforcing Defendants' contractual promises not to "advise, induce, or solicit" Nationwide Life policyholders to "lapse, cancel, or replace" their Nationwide Life policies.

33. In addition to the actual and consequential damages Nationwide Life has sustained by virtue of Defendants' contractual breaches, Nationwide Life also is entitled to attorneys' fees under paragraph 13 of the Special Agent's Agreements.

## COUNT III
## CONVERSION AND MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION

34. The allegations of Paragraphs 1 through 33 are incorporated herein by reference with the same force and effect as if set forth in full below.

35. Nationwide Life's Records, as defined above, are trade secrets and/or confidential information subject to protection under the laws of New York.

36. This information derives independent economic value by not being accessible, through proper means, to competitors who can profit from its use or disclosure.

37. Nationwide Life has taken reasonable measures under the circumstances to maintain the secrecy of this information.

38. Upon information and belief, the foregoing conduct of the Defendants constitutes a misappropriation of Nationwide Life's confidential, trade secret information.

39. As a consequence of the foregoing, Nationwide Life is entitled to recover actual, consequential, and punitive damages.

## COUNT IV
## UNFAIR COMPETITION

40. The allegations of Paragraphs 1 through 39 are incorporated herein by reference with the same force and effect as if set forth in full below.

41. Upon information and belief, Defendants have engaged in acts of unfair competition.

42. As a consequence of the foregoing, Nationwide Life is entitled to recover actual, consequential, and punitive damages.

## COUNT V
## TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE

43. The allegations of Paragraphs 1 through 42 are incorporated herein by reference with the same force and effect as if set forth in full below.

44. Upon information and belief, Defendants have tortiously interfered with the economic advantage of Nationwide Life by, inter alia, diverting the policyholders of Nationwide Life to a competing entity, depriving Nationwide Life of its trade secrets and confidential and proprietary information, and interfering with the contracts between Nationwide Life and its policyholders.

#1261898 v1
106783-61951

45. Defendants acted without privilege or justification.

46. As a consequence of the foregoing, Nationwide Life is entitled to recover actual, consequential, and punitive damages.

WHEREFORE, by virtue of the foregoing acts complained of in Counts II, III, IV, and V, Nationwide Life demands (i) actual and/or consequential damages against Robert Rawiszer in an amount to be determined at trial but in excess of $500,000; (ii) actual and/or consequential damages against David Rawiszer in an amount to be determined at trial but in excess of $500,000; (iii) punitive damages against both Defendants in an amount to be determined at trial but in excess of $500,000 against each Defendant; (iv) the attorneys' fees and costs incurred by Nationwide Life in prosecuting this action; and (v) such other relief as the Court deems proper.

Dated: New York, New York
January 23, 2008

Mark W. Stoutenburg
Paul A. Saso
Gibbons P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
(212) 613-2000
psaso@gibbonslaw.com

Attorneys for Plaintiff
Nationwide Life Insurance Company of America

Of Counsel:

Coss & Momjian, LLP
111 Presidential Boulevard, Suite 233
Bala Cynwyd, Pennsylvania 19004
(610) 667-6800

Exhibit A

## PROVIDENT MUTUAL LIFE INSURANCE COMPANY

### SPECIAL AGENT'S AGREEMENT

This Agreement is effective _02/08/03_ by and between Provident Mutual Life Insurance Company, hereinafter called the Company, and _Robert S. Rawiszer_ hereinafter called the Special Agent. In consideration of the mutual covenants and agreements listed below, the parties agree as follows:

1. **Obligations of the Special Agent**

    The Special Agent's Obligations shall be:

    (a) To solicit and procure applications for all types of insurance and annuities issued or marketed by the Company. All such applications shall be forwarded promptly to the Company, whether the same are reported upon favorably or otherwise by the local medical or paramedical examiner.

    (b) To hold all moneys received or collected on behalf of the Company in trust and immediately remit them to the Company without deduction.

    (c) To provide service incidental to maintaining the policies or contracts of the Company.

    (d) To conform to and observe all applicable federal or state statutes or rules or regulations pertaining to insurance or insurance agents.

    (e) To conform to and observe all Company rules, policies and directives now in effect and as they may be revised from time to time.

2. **Limitation of Authority**

    The Special Agent is not authorized to do, and agrees not to do nor attempt to do, any of the following:

    (a) Accept risks or contracts of any kind or bind the Company in any way.

    (b) Make, alter or discharge any insurance or other contract; or extend the time for paying a premium; or waive forfeitures.

    (c) Incur any debt, obligation or liability for which the Company is responsible.

    (d) Initiate or respond to legal proceedings in the Company's name.

    (e) Market or solicit policies or contracts, directly or indirectly, where the Special Agent and the Company are not properly licensed.

    (f) Pay any rebate of premium either directly or indirectly, or provide any other inducement not specified in the policy, to any person as an inducement to purchase any policy.

    (g) Issue or use any sales material or advertisement, of any form whatsoever, other than those supplied by the Company or with the Company's written approval.

    (h) Violate applicable replacement statutes or regulations.

    (i) Induce or attempt to induce any policyholder to withdraw values from existing policies or relinquish policies with the Company for the purpose of entering into any non-Company transaction that will result in compensation, directly or indirectly, to the Special Agent.

3. **Relationship**

    (a) In performing his or her duties under this Agreement, the Special Agent shall act as an independent contractor and not as an employee of the Company.

    (b) The Special Agent agrees to be governed in the performance of his or her duties by the terms and conditions of this Agreement, and by the rules established by the Company. While an independent contractor, the Special Agent reserves the right to exercise independent judgment in marketing the Company's policies, including the choice of time, place and manner of sale. No other provision of this Agreement nor any rule of the Company shall be construed to abridge this right or create the relationship of employer and employee.

10092 2.98

610 407 1902   NATIONWIDE                                              03:44:16 p.m.   01-04-2008      37/45
13024524668   NATIONWIDE DEL                                           04:19:19 p.m.   12-19-2007      2/4
Case 1:08-cv-00587-DLC   Document 1   Filed 01/23/2008   Page 12 of 19

4. **Commissions**

    (a) Commissions on premiums covering individual life and health insurance policies and annuity contracts produced by the Special Agent and issued by the Company during the continuance of this Agreement, when and as said premiums become due and are actually paid in cash to the Company, shall be paid to the Special Agent in accordance with and subject to all of the terms and conditions of this Agreement and the commission schedules and any Supplement and/or Amendment hereto, and as they may be changed from time to time. It is expressly recognized and agreed that the Company may unilaterally amend, modify or change the commission schedules and any Supplement and/or Amendments hereto in any manner at any time in the future provided, however, that any such amendments, modifications or changes in commissions or fees shall apply only to policies or contracts issued by the Company after the effective date of such change.

    (b) Any commissions which may become payable after the death of the Special Agent shall be paid to the executors, administrators or assigns of the Special Agent.

    (c) To the extent permitted by law, the Company may discharge its obligation under this Agreement to pay compensation due after its termination if the total amount of commissions received by the Special Agent in any full calendar year following termination of this Agreement is less than $600. In such case, no further commissions shall be paid to the Special Agent.

5. **Commission Exceptions**

    (a) Any commissions payable to the Special Agent on premiums on group annuity contracts (including wholesale and franchise coverage) shall be calculated and paid in accordance with separate written agreements between the Special Agent and the Company and shall be at such rates and subject to such terms and conditions as may be fixed by the Company from time to time.

    (b) Commissions on any policy for which rates and conditions are not specified in the applicable commission schedules shall be as determined by the Company.

    (c) No commissions shall be paid to the Special Agent upon any premium, or portion thereof, payment of which is waived in accordance with the provisions contained in the policy because of the disability of the insured or applicant, or the death of the applicant.

    (d) If a policy issued under this Agreement replaces, as defined by the Company, in whole or in part, a policy previously issued by this Company, the Company shall have the right to determine what, if any, commissions or fees shall be allowed.

    (e) If a policy is changed to a different kind or amount, or if its date is changed, the Company shall have the right to determine what, if any, commissions shall be allowed or recovered.

    (f) Commissions, if any, on the conversion of any policy or coverage shall be determined by the Company.

    (g) Commissions, if any, on policies issued on a modified underwriting, guaranteed issue, salary savings basis, for less than published minimum or where classification is other than standard, shall be as determined by the Company.

    (h) If the Company shall return all, or any portion, of any premiums on a policy or contract paid for under this or any previous Agreements, for any reason whatsoever, the Company shall have the right to deduct all or part of the commissions received by the Special Agent on such premiums from any commissions thereafter due and payable to the Special Agent without limitation to any other rights of the Company, including the right to demand immediate repayment from the Special Agent. Any amount remaining unpaid shall be an indebtedness to the Company.

6. **Indebtedness**

    Any indebtedness which is now or may hereafter become due from the Special Agent to Provident Mutual Life Insurance Company or any of its subsidiaries shall be a first lien on all compensation payable under this Agreement until such indebtedness is fully paid, without limitation to any other rights of Provident Mutual Life Insurance Company or its subsidiaries both prior to and after termination of this Agreement to recover such indebtedness.

    This provision shall not be construed in any way to limit the amount of any indebtedness of the Special Agent to the value of the commissions payable under this Agreement. In addition to a deduction from commissions, the Company may take such other actions to recover or collect such indebtedness as it deems appropriate. To the extent the Company takes legal action to recover such indebtedness, it may recover attorney's fees, costs and expenses from the Special Agent.

If the Special Agent is a corporation, the officer of the corporation personally signing this Agreement guarantees the performance of all of its terms and condition, and hereby assumes personal liability and responsibility for any default in said terms and condition, including personal responsibility and liability for repayment of any and all indebtedness owed the company arising out of the terms of this Agreement without the necessity of the Company first enforcing any default against the corporate Special Agent.

7. **Assignment of Commissions**

   This Agreement is not assignable unless authorized in writing by the Company.

8. **Non-Waiver of Rights**

   Neither failure by the Company to exercise any of its rights under this Agreement nor its failure to require the Special Agent to meet his or her obligations hereunder shall be deemed to be a waiver of such right or obligation and shall not in any way interfere with the ability of the Company to exercise such right or require compliance with such obligation either prior to or after termination of this Agreement.

9. **Accounts and Records**

   The Company has a proprietary interest in any books, accounts, computer and/or records, documents, policy record cards, applications, vouchers, letters, written correspondence with policyholders and the Company, and all other items provided by the Company, and relating to or connected with the business of the Company or a subsidiary company, and such accounts and records are the property of the Company. Upon termination of this Agreement by either party, for any reason, the Special Agent agrees to return immediately to the Company all accounts and records as defined above. The Special Agent shall at all times, up to and including the return of said accounts and records to the Company, preserve and protect the confidentiality of such accounts, records and other items. The Special Agent's breach of this confidentiality by releasing any information contained in said accounts, records and other items to other than the client, the client's advisors, or persons specifically authorized by the Company, shall be deemed a violation of this Agreement.

10. **Prior Agreements**

    All previous or existing Agent's Agreements, whether oral or written, between the Special Agent and the Company or any General Agent thereof are hereby terminated.

11. **Change in Agreement**

    The Company reserves the right to unilaterally amend, modify or change this Agreement, including any of the applicable commission schedules and any Supplement and/or Amendment hereto in any manner at any time in the future, provided, however, that any amendment, modification or change in commissions shall apply only to policies or contracts issued by the Company after the effective date of such change.

12. **Termination of Agreement**

    This Agreement shall terminate:

    (a) At any time for any reason whatsoever, with or without cause, by either the Company or the Special Agent giving to the other party written notice delivered in person or sent by ordinary mail to the party's last known address. After such termination, the Special Agent shall be entitled to receive the commissions set forth in the applicable commission schedule for premiums covering policy years 1 to 10 inclusive.

    (b) Immediately upon the death of the Special Agent, if the Special Agent is a natural person. After such termination, the executors, administrators, or assigns of the Special Agent shall be entitled to receive the commissions set forth in the applicable commission schedule for premiums covering policy year 1 to 10 inclusive.

    (c) Immediately and without written notice if the Company determines that the Special Agent has committed any fraudulent, dishonest or illegal act or has misappropriated or withheld funds and the date of such termination shall coincide with the date of the violation or act giving rise to termination. After such termination, no further commissions shall be paid to the Special Agent under the Agreement.

610 407 1902  NATIONWIDE  03:45:32 p.m.  01-04-2008  39/45
Case 1:08-cv-00587-DLC   Document 1   Filed 01/23/2008   Page 14 of 19
13024524668  NATIONWIDE DEL  04:20:48 p.m.  12-19-2007  4/4

### 13. Prohibited Activity

For one year after termination of this Agreement, the Special Agent shall not directly or indirectly advise, induce, or solicit any policyholder of the Company to lapse, cancel, or replace any policy or contract of the Company or borrow values from any policy or contract of the Company to pay any premium on a policy of another Company. In the event the Special Agent violates this provision, the Special Agent agrees that the Company may pursue all remedies, legal or equitable, including injunction, to enforce compliance with this provision and the Special Agent shall be responsible for the payment of any legal fees.

### 14. Insurance Marketplace Standards Association (IMSA)

The Company rules, policies and directives to which the Special Agent is required to conform pursuant to Paragraph 1(e) of this Agreement hereafter also include the Principles of Ethical Market Conduct, as adopted by the Insurance Marketplace Standards Association (IMSA). Provident Mutual Life Insurance Company and its subsidiaries subscribe to the Principles of Ethical Market Conduct and the Code of Ethical Market Conduct in all matters affecting the sale of individually-sold life insurance and annuity products. Currently, these Principles of Ethical Market Conduct are:

(1) To conduct business according to high standards of honesty and fairness and to render that service to its customers which, in the same circumstances, it would apply to or demand for itself.

(2) To provide competent and customer-focused sales and service.

(3) To engage in active and fair competition.

(4) To provide advertising and sales materials that are clear as to purpose and honest and fair as to content.

(5) To provide for fair and expeditious handling of customer complaints and disputes.

(6) To maintain a system of supervision and review that is reasonably designed to achieve compliance with these Principles of Ethical Market Conduct.

### 15. Entire Agreement

This Agreement constitutes the entire Agreement between the parties and supersedes all previous agreements entered into between the parties with regard to the subject matter set forth herein.

### 16. Miscellaneous

The term "Agreement" as used herein, refers to this Special Agent's Agreement, the commission schedules and any Supplement and/or Amendments.

### 17. Severability

If any provision of the Agreement is found to be illegal or otherwise unenforceable, the remainder of this Agreement shall not be affected and shall remain fully enforceable.

### 18. Acknowledgment

By executing this Agreement, the Special Agent acknowledges that he or she has read it in its entirety and is in agreement with the terms and conditions outlining the rights of the Company and the Special Agent, under this Agreement.

PROVIDENT MUTUAL LIFE INSURANCE COMPANY

By _____

X_____
Special Agent

If Special Agent is a Corporation:

By _____

_____
Title

_____
Corporate Name

_____
State of Incorporation

Exhibit B

## Nationwide Life Insurance Company of America

### SPECIAL AGENT'S AGREEMENT

This Agreement is effective ___03/01/07___, by and between Nationwide Life Insurance Company of America, hereinafter called the Company, and ___David Krautzer___ hereinafter called the Special Agent. In consideration of the mutual covenants and agreements listed below, the parties agree as follows:

1. **Obligations of the Special Agent**

    The Special Agent's Obligations shall be:

    (a) To solicit and procure applications for all types of insurance and annuities issued or marketed by the Company. All such applications shall be forwarded promptly to the Company, whether the same are reported upon favorably or otherwise by the local medical or paramedical examiner.

    (b) To hold all moneys received or collected on behalf of the Company in trust and immediately remit them to the Company without deduction.

    (c) To provide service incidental to maintaining the policies or contracts of the Company.

    (d) To conform to and observe all applicable federal or state statutes or rules or regulations pertaining to insurance or insurance agents.

    (e) To conform to and observe all Company rules, policies and directives now in effect and as they may be revised from time to time.

2. **Limitation of Authority**

    The Special Agent is not authorized to do, and agrees not to do nor attempt to do, any of the following:

    (a) Accept risks or contracts of any kind or bind the Company in any way.

    (b) Make, alter or discharge any insurance or other contract; or extend the time for paying a premium; or waive forfeitures.

    (c) Incur any debt, obligation or liability for which the Company is responsible.

    (d) Initiate or respond to legal proceedings in the Company's name.

    (e) Market or solicit policies or contracts, directly or indirectly, where the Special Agent and the Company are not properly licensed.

    (f) Pay any rebate of premium either directly or indirectly, or provide any other inducement not specified in the policy, to any person as an inducement to purchase any policy.

    (g) Issue or use any sales material or advertisement, of any form whatsoever, other than those supplied by the Company or with the Company's written approval.

    (h) Violate applicable replacement statutes or regulations.

    (i) Induce or attempt to induce any policyholder to withdraw values from existing policies or relinquish policies with the Company for the purpose of entering into any non-Company transaction that will result in compensation, directly or indirectly, to the Special Agent.

3. **Relationship**

    (a) In performing his or her duties under this Agreement, the Special Agent shall act as an independent contractor and not as an employee of the Company.

    (b) The Special Agent agrees to be governed in the performance of his or her duties by the terms and conditions of this Agreement, and by the rules established by the Company. While an independent contractor, the Special Agent reserves the right to exercise independent judgment in marketing the Company's policies, including the choice of time, place and manner of sale. No other provision of this Agreement nor any rule of the Company shall be construed to abridge this right or create the relationship of employer and employee.

10392 6.02　　　　　　　　　　　　　Page 1 of 4

4. **Commissions**

   (a) Commissions on premiums covering individual life and health insurance policies and annuity contracts produced by the Special Agent and issued by the Company during the continuance of this Agreement, when and as said premiums become due and are actually paid in cash to the Company, shall be paid to the Special Agent in accordance with and subject to all of the terms and conditions of this Agreement and the commission schedules and any Supplement and/or Amendment hereto, and as they may be changed from time to time. It is expressly recognized and agreed that the Company may unilaterally amend, modify or change the commission schedules and any Supplement and/or Amendments hereto in any manner at any time in the future provided, however, that any such amendments, modifications or changes in commissions or fees shall apply only to policies or contracts issued by the Company after the effective date of such change.

   (b) Any commissions which may become payable after the death of the Special Agent shall be paid to the executors, administrators or assigns of the Special Agent.

   (c) To the extent permitted by law, the Company may discharge its obligation under this Agreement to pay compensation due after its termination if the total amount of commissions received by the Special Agent in any full calendar year following termination of this Agreement is less than $600. In such case, no further commissions shall be paid to the Special Agent.

5. **Commission Exceptions**

   (a) Any commissions payable to the Special Agent on premiums on group annuity contracts (including wholesale and franchise coverage) shall be calculated and paid in accordance with separate written agreements between the Special Agent and the Company and shall be at such rates and subject to such terms and conditions as may be fixed by the Company from time to time.

   (b) Commissions on any policy for which rates and conditions are not specified in the applicable commission schedules shall be as determined by the Company.

   (c) No commissions shall be paid to the Special Agent upon any premium, or portion thereof, payment of which is waived in accordance with the provisions contained in the policy because of the disability of the insured or applicant, or the death of the applicant.

   (d) If a policy issued under this Agreement replaces, as defined by the Company, in whole or in part, a policy previously issued by this Company, the Company shall have the right to determine what, if any, commissions or fees shall be allowed.

   (e) If a policy is changed to a different kind or amount, or if its date is changed, the Company shall have the right to determine what, if any, commissions shall be allowed or recovered.

   (f) Commissions, if any, on the conversion of any policy or coverage shall be determined by the Company.

   (g) Commissions, if any, on policies issued on a modified underwriting, guaranteed issue, salary savings basis, for less than published minimum or where classification is other than standard, shall be as determined by the Company.

   (h) If the Company shall return all, or any portion, of any premiums on a policy or contract paid for under this or any previous Agreements, for any reason whatsoever, the Company shall have the right to deduct all or part of the commissions received by the Special Agent on such premiums from any commissions thereafter due and payable to the Special Agent without limitation to any other rights of the Company, including the right to demand immediate repayment from the Special Agent. Any amount remaining unpaid shall be an indebtedness to the Company.

6. **Indebtedness**

   Any indebtedness which is now or may hereafter become due from the Special Agent to Nationwide Life Insurance Company of America or any of its subsidiaries shall be a first lien on all compensation payable under this Agreement until such indebtedness is fully paid, without limitation to any other rights of Nationwide Life Insurance Company of America or its subsidiaries both prior to and after termination of this Agreement to recover such indebtedness.

   This provision shall not be construed in any way to limit the amount of any indebtedness of the Special Agent to the value of the commissions payable under this Agreement. In addition to a deduction from commissions, the Company may take such other actions to recover or collect such indebtedness as it deems appropriate. To the extent the Company takes legal action to recover such indebtedness, it may recover attorney's fees, costs and expenses from the Special Agent.

If the Special Agent is a corporation, the officer of the corporation personally signing this Agreement guarantees the performance of all of its terms and condition, and hereby assumes personal liability and responsibility for any default in said terms and condition, including personal responsibility and liability for repayment of any and all indebtedness owed the company arising out of the terms of this Agreement without the necessity of the Company first enforcing any default against the corporate Special Agent.

7. **Assignment of Commissions**

   This Agreement is not assignable unless authorized in writing by the Company.

8. **Non-Waiver of Rights**

   Neither failure by the Company to exercise any of its rights under this Agreement nor its failure to require the Special Agent to meet his or her obligations hereunder shall be deemed to be a waiver of such right or obligation and shall not in any way interfere with the ability of the Company to exercise such right or require compliance with such obligation either prior to or after termination of this Agreement.

9. **Accounts and Records**

   The Company has a proprietary interest in any books, accounts, computer and/or records, documents, policy record cards, applications, vouchers, letters, written correspondence with policyholders and the Company, and all other items provided by the Company, and relating to or connected with the business of the Company or a subsidiary company, and such accounts and records are the property of the Company. Upon termination of this Agreement by either party, for any reason, the Special Agent agrees to return immediately to the Company all accounts and records as defined above. The Special Agent shall at all times, up to and including the return of said accounts and records to the Company, preserve and protect the confidentiality of such accounts, records and other items. The Special Agent's breach of this confidentiality by releasing any information contained in said accounts, records and other items to other than the client, the client's advisors, or persons specifically authorized by the Company, shall be deemed a violation of this Agreement.

10. **Prior Agreements**

    All previous or existing Agent's Agreements, whether oral or written, between the Special Agent and the Company or any General Agent thereof are hereby terminated.

11. **Change in Agreement**

    The Company reserves the right to unilaterally amend, modify or change this Agreement, including any of the applicable commission schedules and any Supplement and/or Amendment hereto in any manner at any time in the future, provided, however, that any amendment, modification or change in commissions shall apply only to policies or contracts issued by the Company after the effective date of such change.

12. **Termination of Agreement**

    This Agreement shall terminate:

    (a) At any time for any reason whatsoever, with or without cause, by either the Company or the Special Agent giving to the other party written notice delivered in person or sent by ordinary mail to the party's last known address. After such termination, the Special Agent shall be entitled to receive the commissions set forth in the applicable commission schedule for premiums covering policy years 1 to 10 inclusive.

    (b) Immediately upon the death of the Special Agent, if the Special Agent is a natural person. After such termination, the executors, administrators, or assigns of the Special Agent shall be entitled to receive the commissions set forth in the applicable commission schedule for premiums covering policy year 1 to 10 inclusive.

    (c) Immediately and without written notice if the Company determines that the Special Agent has committed any fraudulent, dishonest or illegal act or has misappropriated or withheld funds and the date of such termination shall coincide with the date of the violation or act giving rise to termination. After such termination, no further commissions shall be paid to the Special Agent under the Agreement.

13. **Prohibited Activity**

    For one year after termination of this Agreement, the Special Agent shall not directly or indirectly advise, induce, or solicit any policyholder of the Company to lapse, cancel, or replace any policy or contract of the Company or borrow values from any policy or contract of the Company to pay any premium on a policy of another Company. In the event the Special Agent violates this provision, the Special Agent agrees that the Company may pursue all remedies, legal or equitable, including injunction, to enforce compliance with this provision and the Special Agent shall be responsible for the payment of any legal fees.

14. **Insurance Marketplace Standards Association (IMSA)**

    The Company rules, policies and directives to which the Special Agent is required to conform pursuant to Paragraph 1(e) of this Agreement hereafter also include the Principles of Ethical Market Conduct, as adopted by the Insurance Marketplace Standards Association (IMSA). Nationwide Life Insurance Company of America and its subsidiaries subscribe to the Principles of Ethical Market Conduct and the Code of Ethical Market Conduct in all matters affecting the sale of individually-sold life insurance and annuity products. Currently, these Principles of Ethical Market Conduct are:

    (1) To conduct business according to high standards of honesty and fairness and to render that service to its customers which, in the same circumstances, it would apply to or demand for itself.
    (2) To provide competent and customer-focused sales and service.
    (3) To engage in active and fair competition.
    (4) To provide advertising and sales materials that are clear as to purpose and honest and fair as to content.
    (5) To provide for fair and expeditious handling of customer complaints and disputes.
    (6) To maintain a system of supervision and review that is reasonably designed to achieve compliance with these Principles of Ethical Market Conduct.

15. **Entire Agreement**

    This Agreement constitutes the entire Agreement between the parties and supersedes all previous agreements entered into between the parties with regard to the subject matter set forth herein.

16. **Miscellaneous**

    The term "Agreement" as used herein, refers to this Special Agent's Agreement, the commission schedules and any Supplement and/or Amendments.

17. **Severability**

    If any provision of the Agreement is found to be illegal or otherwise unenforceable, the remainder of this Agreement shall not be affected and shall remain fully enforceable.

18. **Acknowledgment**

    By executing this Agreement, the Special Agent acknowledges that he or she has read it in its entirety and is in agreement with the terms and conditions outlining the rights of the Company and the Special Agent, under this Agreement.

Nationwide Life Insurance Company of America

By _____

_____
Special Agent

If Special Agent is a Corporation:

By _____

_____
Title

_____
Corporate Name

_____
State of Incorporation